IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN EARL ARTIS, #244-295, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-17-2409 |
| JEREMY W. WOLFORD,[1] et al., | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Frank B. Bishop, Jr., Warden of North Branch Correctional Institution ("NBCI") ("Warden Bishop"); J. Michael Zeigler, Deputy Secretary of Operations for the Department of Public Safety and Correctional Services ("DPSCS"); Wendell M. France, Deputy Secretary of Operations for DPSCS; C.O. II Jeremy W. Wolford, and C.O. II James A. Strope's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 17). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6. (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny without prejudice in part Defendants' Motion.

---

[1] The Court will direct the Clerk to amend the docket to reflect the proper spelling of Defendant Jeremy W. Wolford's name.

## I. BACKGROUND[2]

**A. The Incident**

On March 19, 2017, at around 9:12 a.m., Plaintiff John Earl Artis, an inmate currently incarcerated at NBCI in Cumberland, Maryland was involved in a physical altercation with another prisoner. (Compl. ¶¶ 1, 7, ECF No. 1; Supp. at 2, ECF No. 5).[3] Wolford and Strope responded to the incident and "dispersed a canister of chemical agents." (Comp. ¶ 8). Upon being sprayed, Artis retreated from the altercation. (Id. ¶ 9). Artis attempted to comply with orders by holding out his hands to be hand-cuffed, but Wolford and Strope continued to spray him with chemicals while "striking him in the face, body[,] and head." (Id. ¶ 10). At some point in time, Artis ended up on the ground. (See id. at 12). While Artis was on the ground and "immobilized" and "incapacitated" by the chemical agent, Wolford and Strope began "striking him in the face" and "applying closed[-]fist punches to his head and body." (Id. ¶ 12). Wolford and Strope then proceeded to "kick[ ]" Artis's "body and facial area" and employ "elbow strikes" to Artis's head and face. (Id. ¶ 13; Supp. at 2). Artis "sustained a black eye," swelling and abrasions to his face, head, cheekbone and forehead, injuries to his knee, shin bone, and fibula, and several bruises on his body. (Compl. ¶¶ 14–15).

---

[2] Unless otherwise noted, the facts outlined here are set forth in Artis's Complaint and Supplement (ECF Nos. 1, 5). To the extent the Court discusses facts that Artis does not allege in his Complaint and Supplement, they are uncontroverted and the Court views them in the light most favorable to Artis. The Court will address additional facts when discussing applicable law.

[3] Citations to the Supplement refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

Artis told Wolford and Strope that his skin was "burning" and requested medical treatment for his injuries, which was denied. (Id. ¶¶ 16–17). Artis was then transferred to NBCI's disciplinary segregation unit and was denied a change of clothing. (Id. ¶¶ 16, 19). Artis was also denied decontamination liquids to flush his eyes, face, and skin, as well as a check of his vital signs to ensure that the chemical spray had no adverse effects. (Id. ¶¶ 18, 20–21). "Since the incident, Artis continues to experience sever[e] headaches, dizz[i]ness, pain, and vomiting." (Id. ¶ 29).

Prior to the incident, Artis complained to Warden Bishop about corrections officers, including Wolford, threatening, harassing, and making derogatory comments towards Artis. (Id. ¶ 22). Warden Bishop "failed to investigate" Artis's complaints and "failed to discipline or restrain" the corrections officers. (Id. ¶¶ 22–23). He also was aware of Artis's complaints, but "did nothing other than provide tacit support to [his] subordinates by justifying their unlawful actions." (Id. ¶ 28). Specifically with regard to Wolford, Warden Bishop "maliciously and intentionally allowed [his] actions to go unchecked." (Id. ¶ 25).

## B. The Investigations

After the incident, Lt. Thomas Sawyers ("Lt. Sawyers") conducted a use of force investigation and detailed his findings in a report (the "UOF Report"). (Defs.' Mot. Dismiss Alt. Summ. J. ["Defs.' Mot."] Ex. 1 ["UOF Rep."], ECF No. 17-4). The UOF Report reflects that on March 19, 2017, an incident occurred involving Artis and two other inmates, Dashawn Peterkin and Bobby Arnold. (UOF Rep. at 3). According to the UOF Report, Peterkin chased Arnold from the housing unit to the lobby, striking him with

closed-fist punches. (Id.). A corrections officer managed to restrain Peterkin while Arnold retreated into the housing unit. (Id.).

Artis then ran from the housing unit, across the lobby, and into the corridor in an attempt to assault Arnold. (Id.). Wolford and Strope met Artis in the corridor, positioned themselves in between Arnold and Artis, and gave Artis orders to get on the floor. (Id.). According to UOF Report, Artis continued charging toward Arnold despite Wolford and Strope's orders. (Id.). Wolford then deployed pepper spray on Artis, but Artis continued refusing corrections officers' orders, so Wolford and Strope took him to the floor. (Id.). Wolford and Strope again gave Artis orders to place his hands behind his back, but Artis continued to struggle, attempting to get back up from the floor. (Id.). At that point, "Wolford applied elbow strikes to Inmate Artis'[s] head and shoulder areas" in an effort to get him to comply. (Id.). Wolford and Strope were then able to handcuff Artis and escort him "to the HU2 Medical Room to await medical treatment." (Id.). NBCI's video surveillance system captured footage of the incident, (id.), but the lobby area where Wolford and Strope allegedly assaulted Artis is not visible from any of the cameras, (see Defs.' Mot. Ex. 6, ECF Nos. 17-9, 20).[4] Lt. Sawyers concluded that the level of force the corrections officers, including Wolford and Strope, used was "appropriate and consistent with all applicable policies and the DPSCS Use of Force Manual." (UOF Rep. at 3).

According to the UOF Report, Marilyn Evans, R.N., ("Nurse Evans") treated Artis, Peterkin, and Arnold for pepper spray exposure. (Id.). In a medical report dated March 19,

---

[4] Defendants filed two DVDs containing the footage, which are marked as "filed separately" and are on file in the Clerk's Office.

2017, Nurse Evans noted that Artis complained of pain on his "face and head" and "getting kicked in [the] head." (Id. at 27). Nurse Evans also noted slight bruising on the right eye, a two-centimeter superficial laceration on the left lower eyelid, and redness on the right parietal region of the head. (Id.). She stated that Artis "[r]efused to open eyes," and therefore, she was unable to check his pupils. (Id.). She did not note whether Artis complained of the effects of the pepper spray or whether Artis was treated for its effects.[5] (See id.). Nurse Evans cleaned Artis's laceration with saline and recommended a shower and cold compresses to the head. (Id.).

On March 27, 2017, after Artis filed a grievance through the Administrative Remedy Procedure, Sgt. Robert Fagan ("Sgt. Fagan") of the Intelligence and Investigative Division began another investigation of the incident. (Defs.' Mot. Ex. 5 at 1–2, ECF No. 17-8). On March 30, 2017, Sgt. Fagan interviewed Artis and Peterkin. (Id. at 10). At that time, Artis stated that he was sprayed with pepper spray while lying on his stomach, that he was not resisting, and that he was trying to hold his arms to allow officers to handcuff him. (Id.). Artis also stated that the officers were holding his arms while punching, kicking, and elbowing him to the back of his head. (Id.). Likewise, Peterkin stated that he saw officers jump on Artis and "kick and punch him." (Id.). According to Peterkin, the "staff went overboard," there were about seven to ten officers present, and "Artis was already on the ground and the Officers were yelling that he was resisting but he wasn't." (Id.).

---

[5] Nurse Evans also examined Peterkin and noted that he complained of irritation due to pepper spray. (UOF Rep. at 29). She further noted that Peterkin's lungs were clear, there we no signs of acute distress, and she recommended the "[p]otential for alteration in oxygen r/t pepper spray." (Id.).

5

On April 26, 2017, Sgt. Fagan obtained the video footage of the incident. (Id.). He noted that although the video showed Artis running toward Arnold, it did not show Wolford and Strope restraining Artis. (Id.).

On November 20, 2017, Sgt. Fagan interviewed Wolford and Strope. (Id. at 10–11). Wolford stated that the pepper spray seemed to have no effect on Artis and that Artis continued to resist after the officers brought him to the ground. (Id. at 10). Wolford also stated that he delivered elbow strikes to Artis in an effort to get him to comply until additional staff arrived. (Id.). Similarly, Strope stated that Artis continued to struggle after he was brought to the ground, and that Wolford applied elbow strikes to Artis's head and shoulders to get him to comply. (Id. at 11). Wolford and Strope both stated that they did not witness anyone kicking Artis. (Id.).

At the conclusion of the investigation, Sgt. Fagan noted that although both Artis and Peterkin reported that corrections officers kicked Artis, Nurse Evans' medical report did not support that level of force. (Id.). As a result, Sgt. Fagan concluded that there was no evidence to show that staff used unreasonable force to control Artis. (Id.).

## C. Artis's Lawsuit

On August 22, 2017, while Sgt. Fagan was still conducting his investigation, Artis sued Warden Bishop, Zeigler, France, Wolford, and Strope. (ECF No. 1). In his six-count[6] Verified Complaint, Artis alleges: excessive force in violation of the Eighth Amendment to the U.S. Constitution (Count I); deliberate indifference to serious medical need in

---

[6] Artis styles his Counts as "causes of action" and terms each alleged act that purportedly violated the law as a "count." (See Compl. at 9–15).

violation of the Eighth and Fourteenth Amendments to the U.S. Constitution (Count II); violations of Articles 24 and 26 to the Maryland Constitution (Count III); negligence (Count IV); failure to properly train or supervise in violation of the Fourteenth Amendment to the U.S. Constitution (Count V); and emotional distress (Count VI). (Compl. at 9–15). Artis seeks money damages, injunctive relief, a transfer to a different prison, and costs. (Id. at 16–17; Supp. at 4).

On May 18, 2018, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 17). Artis filed an Opposition on June 1, 2018. (ECF Nos. 22, 25).[7] To date, the Court has no record that Defendants filed a Reply.

## II. DISCUSSION

### A. Conversion of Defendants' Motion

Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any

---

[7] On August 1, 2018, Artis re-filed his Opposition because he learned that the Court "had not received a large portion" of his Opposition. (July 14, 2018 Ltr., ECF No. 25-1). Accordingly, the Court considers Artis's August 1, 2018 Opposition when resolving Defendants' Motion.

material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically

8

file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56.

Here, the Court concludes that both requirements for conversion are satisfied. Artis was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, Artis filed an Opposition that included materials in support of his claims but did not include a request for more time to conduct further discovery. Because the Court will consider documents outside of Artis's Complaint and Supplement in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

**B.     Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be

9

made on personal knowledge" and "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**C. Analysis**

Defendants maintain that Artis fails to allege a violation of his constitutional rights that entitles him to relief under § 1983 as to his excessive force and denial of medical care claims. Defendants also contend that Warden Bishop, Ziegler, and France should be dismissed because there is no respondeat superior liability under § 1983 and that Defendants are entitled to qualified immunity.[8] The Court addresses Defendants' arguments in turn.

    **1.**     **§ 1983 Claims**

        **a.**     **Excessive Force**

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." Boone v. Stallings, 583 F.App'x 174, 176 (4th Cir. 2014) (per curiam) (quoting Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996)). In cases involving excessive force, the Court must determine: (1) "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"—the subjective component, Thompson v. Commonwealth of Virginia, 878 F.3d 89, 98 (4th Cir. 2017) (quoting Hudson v. McMillian, 503 U.S. 1, 6–7 (1992); and (2) "whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious"—the

---

[8] Defendants advance three additional arguments: (1) that corrections officers' alleged harassment and threats directed at Artis do not rise to a constitutional violation; (2) that any allegations Defendants violated State policies, procedures, rules, and regulations fail to state a constitutional claim; and (3) to the extent Artis intends to bring a claim regarding the ARP process, his claim fails. Because the Court does not construe Artis's Complaint and Supplement as alleging these claims and otherwise concludes that there are disputes of material fact that preclude summary judgment in Defendants' favor, the Court declines to address these arguments.

objective component. Boone, 583 F.App'x at 176 (quoting Williams, 77 F.3d at 761). Defendants only argue that Artis fails to establish that Wolford and Strope acted maliciously. Accordingly, the Court confines its analysis to the subjective component.[9]

To determine whether Defendants acted maliciously or sadistically to cause harm, the Court applies a nonexclusive, four-factor balancing test: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." Thompson, 878 F.3d at 99 (citing Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008)).

Here, Artis alleges in his Verified Complaint that Defendants Wolford and Strope "physically assaulted[ ] him by administering kicks, closed[-]fist punches and elbow strike[s] to his person." (Compl. at 10). Artis states that Defendants did so while he was "incapacitated and immobilized" after "being sprayed multiple times with chemical agent." (Id. at 10–11). Artis pleads that Wolford and Strope were "motivated by spiteful, malicious, and evil intent to cause harm or serious injuries" because Artis had previously complained to Warden Bishop about Wolford's provocation and harassment. (Id. at ¶ 26). Artis also produces a Declaration from Peterkin, who attests that "Artis was already [lying] face down with his hands behind his back when both Officer Wolford and Officer Strope [began]

---

[9] Further, the absence of significant injury, alone, is not dispositive of a claim of excessive force. See Thompson, 878 F.3d at 101 (4th Cir. 2017) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010)). The extent of injury incurred is one factor in determining whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically, defendants cannot avoid liability simply because the prisoner had the good fortune to escape serious harm. Wilkins, 559 U.S. at 38.

hitting inmate Artis with closed[-]fist punches, kicks, knees, and elbow strikes to [his] head and body." (Peterkin Decl. ¶ 1, ECF No. 25-2). Peterkin further attests to being aware of Artis's harassment complaints against Wolford. (Id.).

Defendants maintain that Wolford and Strope used only the amount of force that was necessary in the situation. Wolford avers that after he took Artis to the floor, Artis "continued to resist and attempted to get up from the floor." (Wolford Decl. ¶ 8, ECF No. 17-7). Wolford further attests that he "utilized elbow strikes" on Artis's "head and shoulder area" until he complied with Wolford's orders and allowed himself to be handcuffed, and that he stopped using elbow strikes once Artis became compliant. (Id. ¶¶ 8–9). Strope confirms Wolford's account. (Strope Decl. ¶ 8, ECF No. 17-6). In addition, when Sgt. Fagan interviewed Wolford and Strope, both denied that anyone kicked Artis. (Defs.' Mot. Ex. 5 at 10, ECF No. 17-8). Although Defendants submitted video footage of the incident, the recording did not capture Wolford and Strope restraining Artis.

Because Artis's and Peterkin's statements directly contradict Wolford's and Strope's and the video is inconclusive, the Court concludes that genuine disputes of material fact exist as to the type and amount of force Wolford and Strope used and whether they continued to use force after Artis complied with orders. The Court, therefore, cannot determine as a matter of law whether Wolford and Strope acted maliciously and sadistically, precluding summary judgment in their favor. Accordingly, the Court will deny without prejudice Defendants' Motion as to Artis's excessive force claim.

### b. Denial of Medical Care

Artis alleges Defendants violated his constitutional rights when they denied him medical treatment for his injuries following the incident and deprived him of decontamination liquids after he was doused in pepper spray. In their Motion, Defendants assert that Artis was escorted to the medical unit shortly after he was restrained, where Nurse Evans cleaned his laceration and Artis was given a decontamination shower. (Defs.' Mot. at 18). In both Artis's Verified Complaint and in his Opposition, he maintains that he never received a decontamination shower. (Compl. ¶ 20, at 11; Pl.'s Opp'n at 10, ECF No. 25).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976) (citing Furman v. Georgia, 408 U.S. 238, 392–93 (1972)). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th

Cir. 1999)). It is well-established that prompt washing and medical attention sufficiently mitigate the effects of chemical agents. Kitchen v. Ickes, 116 F.Supp.3d 613, 629 (D.Md. 2015) (citing Williams, 77 F.3d at 763), aff'd, 644 F.App'x 243 (4th Cir. 2016).

In this case, it is unclear whether Artis was treated specifically for the effects of the pepper spray. Defendants point to Nurse Evans' medical report on Artis after the incident to demonstrate that he received appropriate treatment. Unlike Nurse Evans' notes on Peterkin's medical chart, however, there is nothing in Artis's medical report to indicate that he was examined for respiratory distress or otherwise received decontamination treatment. Rather, Nurse Evans noted that Artis "[r]efused to open eyes," and therefore, she was unable to check his pupils, (UOF Rep. at 27), a possible indication that Artis was suffering from the effects of the pepper spray. Although Nurse Evans recommended that Artis be allowed to shower following the medical examination, nothing in the record indicates that Artis was allowed to shower. Further, Artis avers that he was not permitted to take a decontamination shower. Thus, there remains a genuine dispute of material fact as to whether Wolford and Strope allowed Artis to shower before escorting him to the disciplinary segregation unit.

The Court, therefore, cannot conclude as a matter of law that Wolford and Strope did not deny Artis appropriate medical care. Accordingly, the Court will deny without prejudice Defendants' Motion as to Artis's denial of medical care claim.

### 2. Supervisory Liability

There is no respondeat superior liability under 42 U.S.C. § 1983. Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Thus, "for an individual to be liable

under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Garraghty v. Com. of Va., Dep't of Corr., 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)). It is well-settled, however, that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). Supervisory liability "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. (quoting Shaw, 13 F.3d at 799).

In his Verified Complaint, Artis states that he complained to Warden Bishop several times about Wolford's and other corrections officers' threats and harassment, but Warden Bishop "failed to investigate" his complaints and "failed to discipline or restrain" the corrections officers. (Compl. ¶¶ 22–23). Artis further states that Warden Bishop was aware

16

of his complaints, but "did nothing other th[a]n provide tacit support to his subordinates[ ] by justifying their unlawful actions" and that he "maliciously and intentionally allowed Wolford's actions to go unchecked." (Id. ¶¶ 25, 28). In addition, Artis avers that Wolford has told Artis that he did not like him "in [an] attempt to ignite a confrontation with Artis." (Id. ¶ 27). Although Artis does not affirmatively allege a causal link between Warden Bishop's inaction and Artis's alleged injuries, liberally construing Artis's Complaint and viewing the evidence in a light most favorable to Artis, the Court can reasonably infer that a causal link exists between Warden Bishop's purported failure to address Artis's harassment complaints against Wolford and Wolford's alleged assault of Artis. With regard to Zeigler and France, Artis's Complaint and Supplement contain no allegations against them, let alone any that would arguably satisfy the elements of a supervisory liability claim under § 1983. Thus, Zeigler and France are entitled to judgment in their favor.

Thus, the Court concludes that there exist genuine disputes of material fact regarding each of the three § 1983 supervisory liability elements as to Warden Bishop, but no genuine disputes of material fact exist as to Zeigler's and France's supervisory liability. Accordingly, the Court will grant Defendants' Motion as to Zeigler and France but deny it without prejudice as to Warden Bishop.

### 3. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts use a two-prong test to determine whether a

government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts have discretion to resolve these two prongs in whatever order they consider appropriate based on the circumstances of the case at hand. Id. at 236. The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds. Batten v. Gomez, 324 F.3d 288, 293–94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first prong, Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993); the defendant on the second, Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

Defendants maintain that they are entitled to qualified immunity. Specifically, they argue that Artis has not established the violation of a clearly established constitutional right. Because genuine disputes of material fact exist regarding whether Wolford, Strope, and Warden Bishop violated Artis's constitutional rights, the Court concludes that a qualified immunity determination would be premature at this time. Accordingly, the Court will deny without prejudice Defendants' Motion on qualified immunity grounds.[10]

---

[10] Defendants do not address the alleged violations of Articles 24 and 26 of the Maryland Constitution or Artis's negligence and emotional distress claims. Consequently, Artis's state law claims remain viable.

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny without prejudice in part Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 17). The Court, in its discretion, will appoint counsel to represent Artis. A separate Order follows.

Entered this 19th day of March, 2019.

/s/
_____
George L. Russell, III
United States District Judge