**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN EARL ARTIS, #255-295      *

        Plaintiff,        *

        v.                 *       Civil No.  GLR-17-2409

JEREMY W. WOLFORD, *et al*.         *

        Defendant.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Warden Frank B. Bishop, Jr., C.O. II Jeremy W. Wolford, and C.O. II James A. Strope, by their attorneys, Brian E. Frosh, Attorney General of Maryland and David W. Ryden, Assistant Attorney General, in support of their Motion for Summary Judgment, file this Memorandum of Law and state as follows:

### I.   INTRODUCTION

Plaintiff is a Division of Correction inmate presently housed at the North Branch Correctional Institution (NBCI) in Cumberland, Maryland. He complains in the instant case that while housed at NBCI, correctional officers used excessive force on him in violation of his 8th Amendment and 14th Amendment rights, negligence, and emotional distress during an incident occurring on March 19, 2017. *See* Plaintiff's Complaint and Supplemental Complaint, ECF Nos. 1 and 5. The complaints seek compensatory and punitive damages, declaratory judgment, injunctive relief, and transfer to another institution. *Id*. On May 18, 2018, the Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 17. Plaintiff filed a brief in opposition to the motion on August 1, 2018. ECF No. 25. On March 19, 2019, the Court granted the Defendants' motion in part granting summary judgment on behalf of Defendants

Deputy Secretary of Operations J. Michael Zeigler and former Deputy Secretary for Operations Wendell M. France, and otherwise denying it without prejudice. ECF No. 27.

In denying the Defendants' dispositive motion related to excessive force as to Officers Wolford and Strope, the Court held as follows:

> Because Artis's and Peterkin's statements directly contradict Wolford's and Strope's and the video is inconclusive, the Court concludes that genuine disputes of material fact exist as to the type and amount of force Wolford and Strope used and whether they continued to use force after Artis complied with orders. The Court, therefore, cannot determine as a matter of law whether Wolford and Strope acted maliciously and sadistically, precluding summary judgment in their favor. Accordingly, the Court will deny without prejudice Defendants' Motion as to Artis's excessive force claim.[…]

ECF No. 26 at p. 13, p. 15.

In denying the Defendants' dispositive motion related to the denial of medical care by Officers Wolford and Strope, the Court held as follows:

> In this case, it is unclear whether Artis was treated specifically for the effects of the pepper spray. Defendants point to Nurse Evans' medical report on Artis after the incident to demonstrate that he received appropriate treatment. Unlike Nurse Evans' notes on Peterkin's medical chart, however, there is nothing in Artis's medical report to indicate that he was examined for respiratory distress or otherwise received decontamination treatment. Rather, Nurse Evans noted that Artis "[r]effused to open eyes," and therefore, she was unable to check his pupils, (UOF Rep. at 27), a possible indication that Artis was suffering from the effects of the pepper spray. Although Nurse Evans recommended that Artis be allowed to shower following the medical examination, nothing in the record indicates that Artis was allowed to shower. Further, Artis avers that he was not permitted to take a decontamination shower. Thus, there remains a genuine dispute of material fact as to whether Wolford and Strope allowed Artis to shower before escorting him to the disciplinary segregation unit.
>
> The Court, therefore, cannot conclude as a matter of law that Wolford and Strope did not deny Artis appropriate medical care. Accordingly, the Court will deny without prejudice Defendants' Motion as to Artis's denial of medical care claim.

ECF No. 26 at p. 15.

In denying the Warden Bishop's dispositive motion related to supervisory liability, the Court held as follows in part:

> Although Artis does not affirmatively allege a causal link between Warden Bishop's inaction and Artis's alleged injuries, liberally construing Artis's Complaint and viewing the evidence in a light most favorable to Artis, the Court can reasonably infer that a causal link exists between Warden Bishop's purported failure to address Artis's harassment complaints against Wolford and Wolford's alleged assault of Artis[…]
>
> Thus, the Court concludes that there exist genuine disputes of material fact regarding each of the three § 1983 supervisory liability elements as to Warden Bishop…Accordingly, the Court will…deny it without prejudice as to Warden Bishop.
>
> ECF No. 26 at p. 17.

Lastly, the Court denied the Defendants' Motion on qualified immunity grounds based on the underlying disputes of material facts of any constitutional violations. *See* ECF No. 26 at p. 18.

A subsequent Motion to Dismiss was filed on behalf of Warden Bishop and Officers Wolford and Strope raising immunity under the Eleventh Amendment in their official capacity and a failure to plead compliance with the notice provisions of the Maryland Tort Claims Act ("MTCA"). ECF No. 44. The motion was granted in part dismissing official capacity claims and denied in part leaving claims of negligence and emotional distress. *See* ECF No. 44.

Present counsel was appointed to appear on behalf of Plaintiff. ECF No. 34. Subsequently, the parties have engaged in discovery.

Defendants Warden Bishop, and Officers Wolford and Strope are entitled to summary judgment in their favor. Plaintiff's own testimony at deposition belies the claims of excessive force, failure to provide medical treatment, and related claims of negligence and emotional distress. Plaintiff's unprovoked attempted assault on another inmate resulted in a good faith application of force and entitles them to judgment in their favor.

3

## II.     FACTUAL BACKGROUND

### Undisputed Material Facts

The March 19, 2017 incident was precipitated by Plaintiff chasing another inmate, Bobby Arnold ("Inmate Arnold"),[1] across the tier along with his bunkmate, Desean Peterkin ("Inmate Peterkin"), without the chance to throw a blow. *See* Exhibit 1, Deposition of John Artis, at p. 50, lines 10-13; p. 55, lines 9-19; and p. 66, lines 14-20.[2] On that key point the parties agree. By his own admission, Plaintiff saw Inmate Peterkin in a foot chase/pursuit of Inmate Arnold, and as he was coming down the steps, he observed blows. *Id*. at p. 56, lines 9, 19-20. Inmate Peterkin was detained near the lobby door, while Inmate Arnold continued to flee. *Id*. at p. 60, lines 7-11. Plaintiff was still chasing Inmate Peterkin and Inmate Arnold when he was stopped by correctional staff. *Id*. at p. 64, lines 2-7; p. 66, lines 19-20. Plaintiff bumped into Officer Fisher who was the first to make physical contact with Plaintiff. *Id*. at p. 60, lines 16-20; p. 66, lines 7-12. He was then maced before going to the ground. *Id*. at p. 66, lines 2-3.[3] Plaintiff was told to put his hands behind his back by correctional staff and to stop resisting. Exhibit 1, Deposition of John Artis, at p. 75, lines 1-9; p. 76, lines 2-3. Once the use of force incident was over, Plaintiff was taken to the sick call room five to six feet away and within two to three minutes and looked over by a nurse. *Id*. at p. 90, lines 10-18; p. 93, lines 8-11; p. 94, lines 7-8. During his evaluation his eyes burned so bad he could not see anything, while a bunch of officers were talking. Id. at p. 92, lines 12-16; p. 94 at

---

[1] Though Plaintiff does not identify Inmate Arnold by name his identity does not appear to be in material dispute.

[2] Excerpts of the parties' deposition transcripts are enclosed; full transcripts are available to the Court upon request. *See also* ECF No. 1 at p. 4, ¶ 7. Plaintiff describes the precipitating events that he was "…involved in a physical altercation with another prisoner…with a number of other prisoners on looking" when the Defendants responded.

[3] *See Id*. at ¶ 9. Plaintiff asserts in his Complaint that upon being sprayed he withdrew himself and retreated from the altercation.

lines 13-17. After evaluation an unidentified officer escorted Plaintiff to a cell. *Id* at p. 99, lines 5-16.

Following the incident on March 19, 2017, Plaintiff was issued a series of institutional infractions. He pleaded guilty to 1) assaulting an inmate, 2) interfering or resisting the performance of staff duties, 3) disobeying an order, and 4) being in a location without authorization. *Id.* at p. 117, lines 8-21; p. 118, lines 1-9.[4]

Prior to March 19, 2017 Plaintiff was vaguely familiar with Officer Strope. *Id.* at p. 127, 17-20; p. 128, lines 1-19. He also described a course of harassing conduct by Officer Wolford over time but did not write any formal written complaints against him. *Id.* at p. 134, 12-19. Plaintiff had his attorney write letters to the Secretary for DPSCS in 2015 and he believes to Warden Bishop complaining about Officer Wolford. Exhibit 1, Deposition of John Artis, at p. 135, lines 8-21; p. 142, lines 1-16. Plaintiff testified that the complaints were for harassment and Officer Wolford making derogatory comments. *Id.* at p. 143, lines 15-16.

### Officer Wolford's Declaration and Deposition Testimony

Officer Wolford states under oath that on March 19, 2017 he was assigned as the Housing 2 Utility #1 officer. ECF No. 17-7 at ¶ 5, Declaration of C.O. II Jeremy Wolford, dated May 14, 2018. At approximately 9:12 a.m. a radio call went out indicating inmate-on-inmate fighting was occurring in the Housing Unit #2 C/D lobby. *Id.* at ¶ 6. Officer Wolford responded through the C/D corridor and observed Plaintiff running toward Inmate Bobby Arnold and ordered Plaintiff to stop. *Id.* at ¶ 6. Plaintiff rushed past Officers Strope and Fisher and entered into the C/D corridor and Officer Wolford pepper sprayed him to slow him down and gain compliance. *Id.* at ¶ 7. Officer

---

[4] Institutional records reflect that the sole count for which Plaintiff was not found guilty was causing a disruptive act. *See* ECF No. 17-8 at pp. 69-77.

Wolford states that Plaintiff continued toward himself and Inmate Arnold and failed to stop despite multiple orders. *Id.* at ¶ 8. Officer Wolford then placed himself between Plaintiff and the other inmate and utilized defensive tactics to gain compliance from Plaintiff and got him to the floor. *Id.* Once Officer Wolford was able to get Plaintiff to the floor he continued to resist and attempted to get up. ECF No. 17-7 at ¶ 8, Declaration of C.O. II Jeremy Wolford. Elbow strikes were then used to Plaintiff's head and shoulder area until he complied with orders and allowed the officers to place handcuffs on him. *Id.* Officer Wolford's training provided him with instruction on how to use elbow strikes as a form of control against a non-compliant inmate for the purpose of controlling behavior and procuring compliance. *Id.* at ¶¶ 11-12.

Officer Wolford was deposed on October 9, 2020 and testified that he was familiar with Plaintiff as the tier officer on Plaintiff's tier. *See* Exhibit 2, Deposition of Jeremy Wolford at p. 47, lines 1-17. He described his relationship with Plaintiff as neither positive nor negative as they did not have any rapport. *Id.* at p. 48, lines 15-22. Officer Wolford knew that Plaintiff was a member of the Bloods and that he knew to keep Bloods separated from Inmate Arnold. *Id.* at p. 59, lines 12-22 and p. 76, lines 13-22.[5] Officer Wolford heard things alerting that something was wrong and observed Inmate Arnold running across the lobby. *Id.* at p. 62, lines 2-9. Officer Wolford also observed Plaintiff running across the lobby, through two officers, and toward Inmate Arnold. *Id.* at p. 62, lines 9-11. Upon observing Plaintiff run into or by Officer Strope, Officer Wolford pepper sprayed him, and Plaintiff ran into Officer Wolford. *Id.* at p. 62, lines 11-13. Plaintiff ran into Officer Wolford, and they took him down while issuing verbal commands to stop resisting to gain compliance. Exhibit 2, Deposition of Jeremy Wolford at p. 62, lines 14-17. While on the ground,

---

[5] Inmate Arnold is Bobby Arnold who Plaintiff was chasing across the tier along with Inmate Peterkin.

Plaintiff was trying to get up. *Id*. at p. 64, lines 20-22. Verbal commands to "stop resisting" did not deter Plaintiff from attempting to get up. *Id*. at p. 65, lines 1-3. Plaintiff laid on his hands and could not be pulled to handcuff him. *Id*. at p. 65, lines 10-15. Because Plaintiff continued to resist and would not comply with verbal commands, Officer Wolford delivered elbow strikes to his head and neck area. *Id*. at p. 65, lines 16-22. Plaintiff continued to refuse to pull his arms out until he was cuffed, and all use of force ceased. *Id*. at p. 65, lines 6-22 and p. 66, lines 1-2. Officer Wolford does not recall whether he and Officer Strope escorted Plaintiff to the medical room but immediately removed himself from the situation. Exhibit 2, Deposition of Jeremy Wolford at p. 67, lines 19-22 and p. 68, lines 1-4.

### Officer Strope's Declaration and Deposition Testimony

Officer Strope states under oath that on March 19, 2017 he was assigned as the Housing 2 D-Wing officer. ECF No. 17-6 at ¶ 5, Declaration of C.O. II James Strope, dated May 11, 2018. At approximately 9:12 a.m. he observed Inmate Deshawn Peterkin chasing Inmate Bobby Arnold in his direction. *Id*. at ¶ 6. Officer Reed secured Inmate Peterkin and Inmate Arnold ran into the C/D corridor. *Id*. at ¶ 7. Plaintiff rushed Officer Fisher to enter the C/D corridor toward Inmate Arnold and he attempted to impede Plaintiff's progress and Officer Wolford deployed pepper spray to gain compliance from him. *Id*. at ¶ 7. Officer Strope continues that Plaintiff continued to attempt to get to Inmate Arnold and both he and Officer Woolford took Plaintiff to the floor. *Id*. at ¶ 8. Officer Strope gave multiple orders for Plaintiff to stop but he did not, resisting and continuing to attempt to get up from the floor. *Id*. Officer Strope states that Officer Wolford used elbow strikes to Plaintiff's head and shoulder area until he complied with orders and allowed Officer Strop to place handcuffs on him. ECF No. 17-6 at ¶ 8, Declaration of C.O. II James Strope.

Officer Strope was deposed on October 9, 2020 and testified that he was essentially a "floater" officer on March 19, 2017 and could be placed in any housing unit on any wing inside the prison. *See* Exhibit 3, Deposition of James Strope, p. 20 lines 2-19. Prior to that date Officer Strope was not familiar with Plaintiff and believed it was their first interaction. *Id*. at p. 48, lines 5-10. On March 19, 2017 Officer Strope observed Inmate Arnold being chased by Inmate Peterkin who began throwing closed fist punches at Inmate Arnold. *Id*. at p. 53, lines 15-19 and p. 55, lines 4-8. Another officer forced Inmate Peterkin against the wall while Inmate Arnold fled into the C/D corridor. *Id*. at p. 56, lines 1-6. Officer Strope went to go handcuff Inmate Arnold and as he entered the corridor observed Plaintiff running towards him in an aggressive manner. *Id*. at p. 56, lines 15-22 and p. 57, line 1. He attempted to impede and grab Plaintiff, but Plaintiff sidestepped Officer Strope and went past him *Id*. at p. 57, lines 21-22 and p. 58, line 1. Officer Wolford then pepper sprayed Plaintiff. *Id*. at p. 58, line 10. Plaintiff still was moving toward Inmate Arnold and Officer Wolford grabbed him to take him to the floor. *Id*. at p. 59, lines 4-6. Plaintiff did not comply with verbal commands by Officer Strope to stop and go to the ground. *Id*. at p. 59, lines 13-17. Plaintiff resisted efforts to get him to the floor while Officer Strope put his hand on his shoulder trying to force him to the ground. *Id*. at p. 60, lines 15-18. Plaintiff tried to get back up to his feet and Officer Wolford gave elbow strikes in order to handcuff him. *Id*. at p. 62, lines 1-5. Plaintiff was then handcuffed. *Id*. at p. 63, lines 6-7, 22. After being handcuffed Plaintiff was escorted to medical which was approximately three feet away. *Id*. at p. 64, lines 14-21 and p. 66, line 11. Officer Strope was then relieved by other staff. *Id*. at p. 66, lines 16-19.

### Warden Bishop's Deposition Testimony

Warden Bishop was deposed on October 12, 2020 and testified that NBCI suffered a lot of violence in the inmate population directed toward staff that had begun to balance out by 2017. *See*

8

Exhibit 4, Deposition of Frank Bishop, Jr., at p. 35, lines 1-9. Prior to the use of force incident he was not aware of any other inmates who had complained to him about Officer Wolford. *Id*. at p. 31, lines 8-9. Warden Bishop was aware of one letter complaining that Officer Wolford harassed Plaintiff. *Id*. at p. 29, lines 17-21. Warden Bishop assigns such a complaint against staff to his investigative captain for investigation though he does not have any independent recollection of what happened as a result of Plaintiff's prior complaint. *Id*. at p. 30, lines 4-13. Prior to the use of force incident on March 19, 2017, Officers Wolford and Strope were not considered to be staff Warden Bishop requiring supervisory monitoring. *Id*. at p. 44, line 11.  Warden Bishop would have been notified about the use of force incident after it occurred verbally or through a use of force report.[6] *Id*. at p. 33, lines 19-22 and p. 32, lines 1-5. Upon review, Warden Bishop found no violations of use of force standards, "unnecessary" force, or any "red flags" seen as warden that would merit further training. *See* Exhibit 4, Deposition of Frank Bishop, Jr. at p. 37, lines 3-13.

## The Use of Force Investigation

Regarding the Plaintiff's allegations, a Use of Force (UOF) investigation was conducted immediately after the incident to determine if the officers involved followed proper procedure. ECF 17-1 (Use of Force Report) at pp. 2-5. Plaintiff refused to give an oral or written statement in the HU#2 medical room on March 19, 2017. *Id*. at p. 25. Based on the reports, the UOF investigator determined that Inmate Peterkin was a Bloods member while Inmate Arnold was a Crips member. *Id*. The investigation concluded that the use and level of force used by all staff during this incident to be appropriate and consistent with all applicable policies and the DPSCS Use of Force Manual. *Id.* at p. 3.

---

[6] Warden Bishop characterized the events of March 19, 2017 as a spontaneous – rather than planned – use of force. *See* Exhibit D at p. 42, line 13.

DPSCS Intelligence & Investigative Division (IID) investigated following an Administrative Remedy Procedure (ARP) filed on March 27, 2017 by Plaintiff claiming that he was assaulted by correctional staff. *See* ECF No. 17-8 (IID Criminal Investigation Report) at p. 9. Plaintiff was interviewed on March 30, 2017 and reported that there was an altercation between himself and another inmate and that it was over. *Id*. at p. 10. He complained that he was maced while lying on his stomach when he was not cuffed and was trying to hold his arms for staff to cuff him. *Id*. Plaintiff continued that staff were holding his arms and punching, kicking, and elbowing him to the back of his head, and that he was not resisting. *Id*. He told the investigator that Officer Wolford's actions were in retaliation for filing a complaint against staff with his attorney about sexual harassment. *Id*. A review of the video showed Plaintiff running across D-Tier toward the area of Inmate Arnold but did not show the actual restraint of him by officers. *Id*. The IID investigation concluded that there was no evidence to show that staff used unreasonable force to control an aggressive inmate. *Id*. at p. 11.

**Medical Records**

Plaintiff received medical attention for pepper spray exposure at approximately 9:59 a.m. on March 19, 2017. ECF 17-5 (Office of Inmate Health Services) at p. 43. Plaintiff's vital signs were taken by the nurse and Plaintiff complained of getting kicked in head, pain over face, head, and nose, with no other complaints of discomfort. *Id.* He was found to be alert and oriented, ambulated without difficulty, and there was slight bruising to the right eye, a 2 cm superficial laceration to his left lower eyelid, and redness to the right region of his head. *Id*. There was no swelling and no bloody discharge, but a small amount of muscus was running from his nose. *Id*. Plaintiff's treatment plan was to cleanse the superficial laceration, shower, and a cold compress to his head. *Id*. He was seen later in the day on March 19, 2017 after his housing unit assignment was

transferred and found to ambulate with a steady gate, respirations even and unlabored. *Id*. at p. 45. Plaintiff complained of swelling to his right facial area and back of head and was observed to have a hematoma below his right eye. ECF No. 17-5 at p.  45. There was no sign of acute bruising/swelling to the back of his head. *Id*. He was released to custody, determined to be stable. *Id*. On March 21, 2017 Plaintiff was seen on a scheduled visit and he complained of injuries to the left side of his head, right eye, left knee, and right shin. *Id*. at p. 47. He reported vomiting approximately two hours after the incident, was in "severe" pain, and "I really need pain medication for this and this needs to be documented." *Id*. A follow up was ordered if his condition worsened. *Id*. at p. 48. Plaintiff's last documented medical complaint for the use of force incident was on March 24, 2017 for dizziness, headaches, and vomiting. *Id*. at p. 50.

All attached records have been certified as true and accurate copies.

## III.   STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A motion for summary judgment may be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S.at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256.

In *Celotex Corp.,* the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324. However, "a mere scintilla of evidence is not enough to create a fact issue." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. N. Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966) *aff'd,* 388 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Based upon this standard, the pleadings and exhibits, the Defendants are entitled to summary judgment.

## IV.   ARGUMENT

### A.  Pepper Spray was Properly Deployed during Plaintiff's Assault of Another Inmate.

It is not *per se* unconstitutional for correctional officers to use mace or pepper spray on inmates who are restrained or confined in their cells. "It is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted). However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment. *Williams*, 77 F.3d at 763. The constitutionality of such a use of force is gauged by the "totality of circumstances." *Williams*, 77 F.3d at 763. In that case, the Fourth Circuit stated: "It is necessary to examine the 'totality of the circumstances,

including the provocation, the amount of gas used, and the purposes for which the gas is used to determine the validity of the use of tear gas in the prison'" *Id.* (quoting *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir. 1984)). The *Williams* court went on to say that

> mace can be constitutionally used in small quantities to "prevent riots and escapes" or to control a "recalcitrant inmate." . . . A limited application of mace may be "much more humane and effective than a flesh on flesh confrontation with an inmate." . . . Moreover, prompt washing of the area will usually provide immediate relief from pain. . . . Furthermore, because a limited use of mace constitutes a relatively "mild" response compared to other forms of force, the initial application of mace indicates a "tempered" response by the prison officials.

*Williams*, 77 F.3d at 763. *Accord Justice v. Dennis*, 834 F.2d 380, 383 (4th Cir. 1987) *cert. granted, judgment vacated on other grounds,* 490 U.S. 1087 (1989) (when reviewing a claim that the use of mace constituted excessive force, "[t]he question of liability turns upon the circumstances in which the mace was used."). *See also Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (a small amount of mace causes only *de minimus* injury, and use of mace is a "measured response" compared to other uses of force); *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984) (mace may be used to control unruly inmate even if restrained); *Young v. Breeding*, 929 F. Supp. 1103, 1106-07 (N.D. Ill. 1996) (no claim where mace properly used on plaintiff's cellmate who had thrown coffee on officer); *Peterson v. Davis*, 551 F. Supp. 137, 146 (D. Md. 1982) *aff'd,* 729 F.2d 1453 (4th Cir. 1984) (approving use of mace to clear dormitory of disruptive inmates). *Cf. Price v. Dixon,* 961 F. Supp. 894, 900 (E.D.N.C. 1997) (qualified immunity on claim of use of mace and four point restraints on unruly inmate); *Norris v. Detrick*, 918 F. Supp. 977, 982 (N.D.W. Va. 1996) *aff'd,* 108 F.3d 1373 (4th Cir. 1997) (qualified immunity for use of mace, even where extensive injury caused, to control inmate who refused orders to return to cell while demonstrating martial arts kicks and verbally threatening officers); *Cf. Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002)

13

(same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Eighth Amendment violations have also been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions. *See Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray as a first resort without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was [pepper] sprayed without warning").

If an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell). Use of chemical agents is also reasonable when a prisoner attempts to escape or evade an officer's control. *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Here, Plaintiff's own conduct – chasing another inmate along with a confederate – escalated from ignoring verbal commands to a physical intervention and the use of pepper spray. Upon first being spotted chasing Inmate Arnold, Plaintiff's attack would only be stopped by reaching his intended target or through the intervening

14

force of correctional staff. When he ignored repeated verbal orders, he had to be pepper sprayed which was reasonable and permissible.

## B. Excessive Force

A claim that prison officials used excessive force on an inmate and thereby inflicted cruel and unusual punishment in violation of the Eighth Amendment involves both objective and subjective elements. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998). The objective element of the analysis requires a determination whether the defendants' actions offend contemporary standards of decency. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To answer this question, the Court weighs five factors: 1) the need for the application of the force, 2) the relationship between the need for the use of force and the amount of force used, 3) the extent of the injury inflicted, 4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the defendants, and 5) any efforts made to temper the severity of the use of force. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The subjective element of the analysis requires a determination of "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.

In *Wilkins v. Gaddy*, 559 U.S. 34 (2010) the Supreme Court explained that its holding in *Hudson v. McMillian*[7] did not stand for the proposition that "a certain quantum of injury [needed to be] sustained to make out an excessive force claim, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. 34. The Court did not want an inmate who was the victim of excessive force to lose the ability to pursue an excessive force claim because he had "the good fortune to escape without serious injury." *Id.* at 38. Absence of serious injury, however is not irrelevant. Absence of

---

[7] 503 U.S. 1 (1992).

injury indicates that the amount of force, *if any*, was minuscule. A "push or shove" without any resulting discernible injury almost always fails to state a claim for excessive force because the Eighth Amendment's prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id*. (quoting *Hudson,* 503 U.S. at 9). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1024 (D. Md. 2003).

A "mere scintilla" of evidence is not enough to create a fact issue. *Barwick v. Celotex Corp., supra* at 958-59. There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250 (1986)*.* Plaintiff's bald accusations of a gratuitous assault is simply not probative and no jury could return a verdict in his favor on the issue. Summary judgment in favor of Officers Wolford and Strope is right and just in this case.

Here the record irrefutably demonstrates that the Plaintiff did not suffer an excessive use of force. What little force was used against the Plaintiff was necessary to maintain order. In examining the *Whitley* factors, the need for force was undoubtedly necessary given the imminent attack launched by Plaintiff on another prisoner. It was used to prevent an active assault was the actual and metaphorical application of Newton's First Law between Plaintiff and his intended victim. The video reflecting Plaintiff's clear intent shows the extent of the threat he posed to the layman, made even stronger in an institutional setting and amplifies the fourth *Whitley* factor. Staff presence, verbal commands, and pepper spray were ineffective. Escalating physical intervention

16

was required to gain compliance. Once Plaintiff ceased to be a threat the force applied ceased as if there were any gratuitous and constitutionally impermissible usage it would surely be reflected in more serious injuries. The medical record does not support Plaintiff's contention that he was kicked, beaten, or any amount of excessive force was used, rather it instead bolsters the force as minimal and applied in good faith to maintain order and discipline. With an independent documentation on March 19-21, 2017 of slight bruising, a superficial laceration, and some redness, it is hardly injury from that of an *excessive* use of force claim, especially in light of medical documentation beyond those dates. Plaintiff's bald accusations are simply not probative, and no jury could return a verdict in his favor on the issue. As he did not suffer a constitutional dereliction summary judgment in favor of the Defendants is merited.

With regard to Plaintiff's general claim that the Warden Bishop somehow was deliberately indifferent to his prior complaint about Officer Wolford, in order to make a valid claim under the Eighth Amendment, a prisoner must satisfy two elements. A prison official may be liable for harm an inmate suffers at the hands of another if two criteria are met: (1) the harm is objectively "sufficiently serious," which, in relation to a claim based on failure to prevent harm means that conditions exist "posing a substantial risk of serious harm;" and (2) the official shows a "deliberate indifference" to that harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted). To allege that a correctional official has been deliberately indifferent to a serious risk of harm, the inmate must allege that the official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must *also draw that inference*." *Farmer v. Brennan*, 511 U.S. at 837 (emphasis added). The subjective component "sets a particularly high bar to recovery" not met by a showing of mere negligence, requiring instead 1) "actual knowledge

of the risk of harm to the inmate"; and 2) recognition that the official's actions "were insufficient to mitigate the risk of harm to the inmate." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quotations and internal citations omitted, emphasis in original). Moreover, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. at 844.

At best there is an immemorable previous complaint Plaintiff made about Officer Wolford to Warden Bishop. A complaint that Warden Bishop appropriately referred for investigation and would have taken action had it been merited. Even if the prior complaint of harassment were noteworthy or requiring discipline it does not by its mere existence place Warden Bishop in a permanent deliberate indifference status. This is crucially important when noting that this incident was a *spontaneous* use of force precipitated by Plaintiff's admitted aggression. Here, it is a matter of record that the UOF investigation concluded that the level and use of force by all officers involved was appropriate and consistent with all applicable policies and the DPSCS Use of Force Manual. The IID investigation into that claim was also found to be unsubstantiated. Warden Bishop was not deliberately indifferent to any so-called misconduct.

## C.  Plaintiff was not Denied Medical Care

To state a claim for denial of medical care a prisoner must allege facts from which a trier of fact could find that the defendants' acts or failures to act amounted to deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). As in other Eighth Amendment contexts, there are two components to this test: an objective component, *i.e.*, serious medical need; and a subjective component, *i.e.*, deliberate indifference. *See, e.g., Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995). In other words, as the Fourth Circuit recently stated, "in order to establish a claim of deliberate

indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

The objective component of this test requires that the plaintiff demonstrate the existence of a serious medical condition. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle*, 429 U.S. at 105; *Johnson*, 145 F.3d at 167; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). The right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). "[B]ecause society does not expect that prisoners will have unqualified access to health care,' the objective component of an Eighth Amendment claim based on deprivation of medical attention is satisfied only if the medical need is 'serious." *Shakka*, 71 F.3d at 166 (quoting *Hudson*, 503 U.S. at 9). "[A]n injury or condition is 'serious' only if it is 'life-threatening or poses a risk of needless pain or lingering disability if not treated at once." *Anderson-El v. O'Keefe*, 897 F. Supp. 1093, 1096 (N.D. Ill. 1995) (minor abrasion not serious) (quoting *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)). A "serious medical need" is one which a physician has found requires treatment or one that is "so obvious that even a lay person would easily recognize the need for a doctor's attention." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999). *Cf. Cooper v. Dyke*, 814 F.2d 941, 945 (4th Cir. 1987) (intense pain from untreated bullet wound serious); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986) (jury could infer deliberate indifference from failure to obtain medical care for inmate dying from infection caused by bone caught in throat where symptoms would have been obvious); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) (excruciating pain from delayed treatment of broken arm serious), *cert. denied*, 446 U.S. 928 (1980).

The subjective component of an Eighth Amendment claim related to denial of medical care requires a showing that the defendant acted with deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Deliberate indifference occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms. *Johnson*, 145 F.3d at 168. As most recently stated by the Fourth Circuit, "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001) (allegations insufficient where officers used mace to subdue subject who was acting strangely and resisted attempts to take him to hospital, and where subject later died in hospital from heart trouble). In addition, the Fourth Circuit has stated that

> Deliberate indifference is a very high standard—a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

*Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

Here, it is a matter of record Plaintiff was taken to the housing medical unit – approximately three feet away from the use of force incident – for treatment immediately after the use of force. Officers Wolford and Strope demonstrated the antithesis of deliberate indifference as they did assist in bringing him to medical immediately and correctly did not remain after transportation of several feet to remove themselves from an inmate who provoked a use of force. Plaintiff's own recollection was that he could not see who was present during the examination among numerous

staff and the officer who escorted him to a cell once the treatment was completed was notably un-identified. The medical records do not support that he was denied medical care or a decontamination shower at all, least of which by these Defendants, and cannot show deliberate indifference to his medical needs.

### D. Supervisory Liability

There is no *respondeat superior* liability under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 677(2009)(an official "is only liable for his [] own misconduct.")*; Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Therefore, supervisory correctional officials can be held liable only for their own personal wrongdoing or for supervisory actions that themselves violate constitutional norms. To establish supervisory liability in a § 1983 action, the Fourth Circuit has held that it must be evidence showing:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). *See also Slakan*, 737 F.2d at 373. In order for liability to exist under § 1983, there must be personal involvement by the defendants in the alleged violation. *Shaw*, 13 F.3d 791. *See also, Vinnedge*, 550 F.2d at 928; *Rizzo*, 423 U.S. at 370-71.

Supervisory liability is "determined 'by pinpointing the persons in the decision making

chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'"

*Shaw*, 13 F.3d at 798 (quoting *Slakan*, 737 F.2d at 372-73).

 "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). The Seventh Circuit explains that a prisoner's litigation tactic of "working down through [the Department's] organization chart" alleging that "anyone who knew or should have known" of his complaints, "and everyone higher up the bureaucratic chain, must be liable" for deliberate indifference to a serious risk of harm, "is a bad one." *Burks*, 555 F.3d at 593. Addressing the assertion of liability against an official responsible for processing inmate grievances who dismissed the inmate's grievance regarding his lack of medical treatment as untimely, *Burks* noted that:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.

*Id.* As *Burks* noted, recognizing a theory of supervisory liability against prison official far-removed from day-to-day prison administration "is just an effort to evade, by indirection, *Monell*'s rule that public employees are responsible for their own misdeeds but not for anyone else's." *Burks*, 555 F.3d at 596.

Or, perhaps more simply stated: liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh,* 275 F.3d 391, 402  (4th Cir. 2001)

(internal citation omitted). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Here, nothing in Plaintiff's allegations provides any basis for finding that Warden Bishop personally violated his federal constitutional rights or satisfied the Fourth Circuit's factors under *Shaw*. Even accepting Plaintiff's averment of a letter to Warden Bishop sent on his behalf, a singular instance is hardly pervasive and does not lead to the *unreasonable* risk that is required. Neither has Plaintiff shown that Warden Bishop's response in assigning it for investigation was inadequate nor shown an affirmative causal link to any alleged constitutional injury. As he fails to meet all three factors under *Shaw*, Warden Bishop is entitled to summary judgment in his favor.

### E. Defendants Have Not Violated Any Clearly Established Constitutional Right Of Which A Reasonable Public Official Should Have Known And Are Therefore Entitled To Qualified Immunity.

The Defendants assert that they are entitled to summary judgment on the basis of qualified immunity as to all claims. The evidence has established that the Defendants have not violated any clearly established constitutional right of which a reasonable public official should have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Anderson v. Creighton*, 483 U.S. 635 (1987); *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988); *Taratino v. Baker*, 825 F.2d 772 (4th Cir. 1987); *Young v. Lynch*, 846 F.2d 960 (4th Cir. 1988) (application to disciplinary committee members). Qualified immunity "is intended to allow public officials to act, with independence and without fear of consequences, where their actions do not implicate clearly established rights." *Turner v. Dammon*, 848 F.2d at 443 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

Under the standard articulated in *Harlow v. Fitzgerald*, and *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the question of whether a government or public official is entitled to summary judgment based on qualified immunity generally turns on the "objective reasonableness of the action, assessed in light of the legal rules that were 'clearly established at the time the action was

23

taken.'" *Harlow*, 457 U.S. at 818; *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) ("The salient question . . . is whether the state of the law at the time of the incident provided 'fair warning' to the defendants."). The clearly established law must not be defined at a "high level of generality," to be clearly established, precedent must establish the constitutional issue "beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Qualified immunity thus protects public officials not only from liability, but from the vexations of trial. *See Mitchell*, 472 U.S. at 526. The Fourth Circuit stated: "[o]fficials 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known.'" *Turner v. Dammon*, 848 F.2d at 443 (quoting *Harlow*, 457 U.S. at 818).

Here, in the instant matter, it is manifestly clear that the "objective reasonableness" of the Defendants' actions result in qualified immunity.  As stated, *supra*, Plaintiff has acknowledged a physical altercation on another inmate during the March 19, 2017 incident interrupted only by the actions of correctional officers who owe a duty of care to Inmate Arnold – Plaintiff's target. The escalating intervention and the spontaneous use of force used by the Defendants during an active assault on a fleeing inmate in a correctional setting is objectively reasonable. While the video footage (ECF No. 17-8) may not be capture the moment Officers Wolford and Strope restrained Plaintiff it serves a bifurcated purpose – to show the *objective* exigency of Plaintiff's clear intent to assault, and more importantly to tangibly capture the insufficient time Officers Wolford and Strope had to *subjectively* act maliciously or sadistically until Plaintiff was no longer a threat to Inmate Arnold, correctional staff, or institutional security. Put another way rather than receiving a correctional laureate for protecting Inmate Arnold from imminent harm by their actions, Officers Wolford and Strope find themselves on the business end of a federal civil rights claim by one of

Inmate Arnold's assailants. Given the status of the law, and even if the Plaintiff had stated a claim, the Defendants' actions cannot be held to have violated "clearly established" legal rules.

### F.  State Law Immunity

Maryland statutes provides a limited form of immunity for state employees such as correctional officers for actions taken in the course of their employment. Section 5-522(b) of the Courts and Judicial Proceedings Article, Md. Ann. Code (2000 Cum. Supp.), grants immunity from suit to any state employee for torts committed within the scope of their duties as long as they were not acting with malice or were not grossly negligent.[8] The threshold level of conduct is high. Malice is "actual malice," and gross negligence wanton or reckless disregard for the safety of others. *See Young v. City of Mount Ranier*, 238 F.3d 567 (4th Cir. 2001). In *Young*, the Fourth Circuit held that allegations that were insufficient to state a claim of deliberate indifference to a serious medical need were also insufficient to state a claim of malice or gross negligence so that the defendants' shield of immunity was breached. *Id*. In particular, the Court noted: "Given that the complaint itself alleges that Young struggled with the officers, the mere use of pepper spray and restraints does not give rise to an inference of malice or gross negligence." *Id. See also Thomas v. City of Annapolis*, 113 Md. App. 440, 455 (1997) (malice is "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff"). *See generally Shoemaker v. Smith*, 353 Md. 143 (1999) (comparing § 1983 qualified immunity and Maryland statutory immunity for government officials). *Cf Okwa v. Harper*, 360 Md. 161, 182 (2000) (fact-finder could infer malice from particular allegations of unnecessary use of force against non-resisting arrestee).

---

[8] *Cf.* Md. Code Ann., Cts. & Jud. Proc. § 5-507(b)(1), providing qualified immunity for officials of municipal corporations.

Law enforcement officers are public officials entitled to the shield of immunity for non-malicious acts in the course of their employment. *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 138 (2000). The same is true of correctional officers. *See Carder v. Steiner*, 225 Md. 271, 273 (1961) *overruled on other grounds by James v. Prince George's Cnty.*, 288 Md. 315 (1980).

In Maryland, there is no common law doctrine of qualified immunity protecting government officers from liability for constitutional torts. *Okwa*, 360 Md. at 201; *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 546 (1996). However, Article 24 of the Maryland Declaration of Rights protects the same interests, and is *in pari materia* with, the Fourteenth Amendment and § 1983. *See, e.g., Okwa*, 360 Md. at 202-03; *Davidson v. Koerber*, 454 F. Supp. 1256, 1260 (D. Md. 1978). Thus, where insufficient facts are alleged to establish a deprivation of a federally protected constitutional right, it is unlikely that a corresponding claim of deprivation of a state constitutional right can withstand dismissal.

Plaintiff cannot establish facts demonstrating the high level of conduct showing actual malice by Officers Wolford and Strope, or any gross negligence by Warden Bishop. Therefore, dismissal of the state claims is proper as well.

## V.    CONCLUSION

Defendants Warden Frank B. Bishop, Jr., C.O. II Jeremy W. Wolford, and C.O. II James A. Strope respectfully request that summary judgment be entered in their favor.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland


_____/s/_____
DAVID W. RYDEN
Assistant Attorney General
Federal Bar No. 21204

St. Paul Plaza - 19th Floor
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-6598 (Telephone)
(410) 576-6880 (Telefax)
E-mail: dryden@oag.state.md.us

Attorneys for Defendants