IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN EARL ARTIS, #244-295,              *

    Plaintiff,                           *

v.                                      *       Civil Action No. GLR-17-2409

JEREMY W. WOLFORD, et al.,              *

    Defendants.                          *

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Frank B. Bishop, Jr., Warden of

North Branch Correctional Institution ("NBCI"), C.O. II Jeremy W. Wolford, and C.O. II

James A. Strope's Motion for Summary Judgment. (ECF No. 69). The Motion is ripe for

disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the

reasons outlined below, the Court will deny Defendants' Motion.

## I.     BACKGROUND

John Earl Artis is an inmate incarcerated at NBCI in Cumberland, Maryland.

(Compl. ¶ 1, ECF No. 1). Artis contends that on March 19, 2017, correctional officers used

excessive force on him and failed to give him proper medical care. (Compl. ¶¶ 7–21).

## A.     Factual Background

### 1.     The March 19, 2017 Incident

On March 19, 2017, around 9:12 a.m., during a period when inmates could leave

their cells, Artis was walking to the barbershop with his bunk mate, Dashawn Peterkin.

(John Artis Deposition ["Artis Dep."] at 50:1–7, ECF Nos. 69-3, 70-3).[1] Artis decided to take a detour to drop something off with another inmate near the back of their housing unit while Peterkin continued to the barbershop. (Id. at 50:6–13). As Artis headed to the back of the unit, he heard a "scuffle" and "ran back" because he was worried that Peterkin was in danger. (Id. at 50:7–12, 52:1–3, 55:9–12). When he got there, Artis saw Peterkin chasing another inmate, Bobby Arnold. (Id. at 55:15–16; James Strope Dep. ["Strope Dep."] at 55:4–8, ECF No. 69-5). Artis thought Arnold had "done something," and Peterkin and Arnold started to fight. (Artis Dep. at 55:19–57:1–3). Arnold then began to flee from Peterkin and Artis ran after him. (Id. 55:6–12). In trying to get to Arnold, Artis ran by Officer Reed and Officer Fisher, bumped into Officer Fisher, and "stumbled forward." (Id. 64:16–20, 65:12–13, 66:9–20).

The parties disagree about what happened next, so the Court will outline their testimony in turn. According to Artis, an officer maced him around the time that he stumbled. (Id. at 68:6–20). Artis's eyes felt like they were "on fire" and his whole face "started burning." (Id. at 78:13–79:5). He then remembers falling to the ground, lying on his stomach, and getting maced a second time. (Id. at 69:9–21). Someone told him to put his hands behind his back, he complied, and he was handcuffed. (Id. at 69:9–21, 71:16, 73:15–19, 75:1–5).

Because of the pain from the mace, Artis largely kept his eyes closed. (Id. 77:17–21). After he was handcuffed and while he was still prone on his stomach, he looked up

---

[1] The parties each attach pages from Artis's deposition to their respective filings.

and saw Defendant Jeremy Wolford "coming down [at him] with his elbow." (Id. at 67:6–18). Wolford struck Artis in the head two or three times. (Id.). When Artis turned his head to avoid the strikes, Defendant James Strope punched him in the face around four times. (Id. at 67:12–18, 77:14–78:3). Artis moved defensively and tried to turn his head to avoid the punches. (Id. at 73:5–14). Strope then told him to stop resisting. (Id. at 76:2–12). Artis overheard Peterkin respond that Artis was not, in fact, resisting. (Id. at 76:9–10). An officer was holding his leg and another one was kicking him in his shins but he could not tell who they were. (Id. at 72:21–73:4).

Wolford testified at his deposition that, on the morning of March 19, 2017, he saw Artis "come running across the lobby" toward Arnold. (Jeremy Wolford Dep. ["Wolford Dep."] at 62:6–17, ECF No. 69-4). Artis "ran through two officers" and ran "either by or into" Strope. Wolford then "sprayed him with the mace." (Id.). After being sprayed, Artis "ran into" Wolford, who "grabbed ahold of him." (Id. at 64:2–13). The pair "ended up on the ground and then were rolling around." (Id. at 64:19–22). Artis tried to get up, so Wolford attempted to "gain[] control" and gave Artis "verbal commands" to stop resisting. (Id. at 64:19–65:3). Wolford stated that Artis "still continued to try and get up," but that he was simultaneously "laying on his hands so that [the officers] couldn't pull them underneath him and cuff him up." (Id. at 64:19–65:12). When Artis did not "comply" with their commands, Wolford administered "elbow strikes" to Artis's head and neck. (Id. at 65:16–22). Wolford did not recall "how [Artis] started out with his arm under him." (Id. at 66:11–15). Wolford also could not recall who handcuffed Artis, but he stated that once Artis was handcuffed, the "use of force stopped completely." (Id. at 66:22–67:4).

Officer James Strope testified that after the altercation between Arnold and Peterkin, he followed Arnold to handcuff him. (Strope Dep. at 56:5–19). Strope was unable to handcuff him, though, because he saw Artis "running" toward Arnold. (Id. at 56:18–57:1, 57:9–14). Strope tried to grab Artis, but Artis "side-stepped" and made it past him. (Id. at 57:21–58:1). Wolford then pepper sprayed Artis. (Id. at 58:8–10). After he was pepper sprayed, Artis continued to try to get to Arnold, so Wolford "grabbed ahold of him and tried to take him to the floor." (Id. at 59:2–6). Strope told Artis to "stop and get on the ground," but Artis did not comply. (Id. at 59:13–17). Strope testified that Artis was "resisting." (Id. 60:6–10). Wolford then administered elbow strikes to try and get Artis to put his arms behind his back. (Id. at 62:1–5). Strope told Artis to "stop resisting," and to "[p]ut [his] hands behind [his] back." (Id. at 62:10–17). Eventually, the officers were able to place Artis in handcuffs, ending the conflict. (Id. at 63:6–7).

Video surveillance did not capture the incident. (See Video Surveillance Footage, ECF No. 17-9).[2]

### 2. Medical Treatment

According to Artis, two or three minutes after the altercation, Wolford and Strope dropped him off to a nurse to be evaluated. (Artis Dep. at 92:1–8, 93:10–11). The nurse was located about five or six feet from where the altercation took place. (Id. 94:5–8). Artis recalled that the nurse "kept on trying to get [him] to open [his] eyes." (Id. at 92:12–16).

---

[2] Defendants filed two DVDs containing the footage, which are marked as "filed separately" and are on file in the Clerk's Office.

He struggled to open them, though, because of the pain from the pepper spray. (Id.). Artis complained of pain to his eyes, head, and leg. (Id. 94:13–21). The nurse recommended that Artis take a decontamination shower to help remove the mace. (Id. at 99:5–16). Artis was not permitted, however, to take a shower. (Id.) Instead, he was strip searched and returned to a cell. (Id.).

A review of the medical records shows that on March 19, 2017, at around 10:00 a.m., Marilyn L. Evans, RN, saw Artis for an "altercation." (Pl.'s Med. Rs. at 43, ECF No. 17-5). Evans noted that Artis was "complaining of getting kicked in [the] head," pain over his face and head, and pain to his nose. (Id.). Evans wrote that Artis had a two-centimeter-long laceration on his left lower eyelid, bruising over his right eye, and redness on his head. (Id.). She remarked that Artis "[r]efused to open [his] eyes." (Id.). Evans assessed Artis as having an "alteration in comfort related to altercation." (Id.). Although she did not indicate that Artis was maced, she recommended that Artis receive a decontamination shower. (Id.). She also wrote that he should be given cold compresses and have his laceration cleaned with saline. (Id.). Evans wrote that he should submit a sick call slip if he developed signs of an infection. (Id. at 44).

Artis testified in his deposition that later that day, he experienced dizzy spells and vomiting. (Artis Dep. at 101:2–20). He was unable to stand without assistance from Peterkin because of his dizziness. (Id.). After around a half hour or forty-five minutes, the burning in Artis's eyes ceased, but he continued to experience a burning sensation in his face and neck. (Id. at 103:6–13).

Around 4:50 p.m. that afternoon, Artis was seen by Breauna L. Baker, RN. (Pl.'s Med. Rs. at 45). She noted that Artis complained of swelling to the right side of his face and to the back of the head. (Id.). She also observed that Artis had a hematoma under his right eye. (Id.). She assessed that Artis had an "[a]lteration in comfort" and referred him to see a provider on March 20th. (Id.). Baker did not note the use of pepper spray or indicate anything regarding a shower. (Id.).

On March 21, 2017, Artis was seen by Krista Bilak, RNP. (Id. at 47). Bilak noted that Artis complained of injuries to the left side of his head, right eye, left knee, and right shin. (Id.). She wrote that Artis "became dizzy and vomited once approximately 2 hours after the incident." (Id.). She noted further that Artis complained of "severe pain" and asked for his complaints to be "documented." (Id.). In Bilak's review of systems, she wrote that Artis experienced "[n]o vision changes or headaches" and "[n]o vomiting." (Id.). She noted a three-centimeter abrasion to Artis's right shin, an abrasion to his right cheek, and a bruise under his eye. (Id. at 48).

Artis testified that he was not allowed to take a shower for two days, his next scheduled date for a shower, despite his requests to staff. (Artis Dep. at 104:10–105:17).

On March 23, 2017, Artis filed a "sick call" indicating that he was having bad headaches, dizzy spells, and vomiting for a couple days. (Pl.'s Med. Rs. at 22). The following day, Artis again saw Baker with complaints of headaches, vomiting, and dizziness. (Id. at 50). Artis was "educated on head injuries" and advised to increase his fluid intake. (Id.).

### 3.      Officer Wolford's Prior Treatment of Artis

Artis testified in his deposition that Officer Wolford had a history of harassing him. (Artis Dep. at 133:1–44:2). Officer Wolford would "intentionally try[] to provoke Artis," and then write Artis up for a rule violation. (Id. at 133:8–11). In one example of harassment, after Artis complained to a sergeant about Wolford's behavior, Wolford called him "a snitch" in front of other inmates. (Id. at 133:17–21). In 2015, Artis asked his attorney to file a complaint to the Secretary for the DPSCS about Officer Wolford's "harassment and . . . derogatory comments." (Id. at 135:6–21). The complaint did not stop the negative treatment, though—Officer Wolford would still "say[] some of the same derogatory things." (Id. at 133:17–34:3).

Officer Wolford testified at his deposition that his relationship with Artis was "in the middle," and that "it wasn't positive or negative because we really didn't have—we didn't have any rapport at all." (Wolford Dep. at 48:15–22). He stated that he "never had any problems with [Artis] other than" the March 19, 2017 incident. (Id. at 76:9–12).

Warden Frank Bishop, Jr. testified that he reviewed a letter alleging that Wolford had harassed Artis. (Frank Bishop, Jr. Dep. ["Bishop Dep."] at 29:1–21, ECF No. 69-6). He recalled reviewing "something referencing medical as well." (Id.). Bishop said he was familiar with his officers on a "cursory basis" as part of his "management style." (Id. at 30:19–31:2). Bishop stated that, to his knowledge, no other inmates had made complaints about Wolford. (Id. at 31:3–9). Bishop indicated that he was familiar with Artis, who he described as "a difficult individual to manage." (Id. at 31:10–17).

### 4.    The Use of Force Investigation

After the incident, Lt. Thomas Sawyers ("Lt. Sawyers") conducted a use of force investigation and detailed his findings in a report (the "UOF Report"). The UOF Report reflects that on March 19, 2017, an incident occurred involving Artis and two other inmates, Dashawn Peterkin and Bobby Arnold. (Serious Incident or Use of Force Report ["UOF Rep."] at 3, ECF No. 17-4). According to the UOF Report, Peterkin chased Arnold from the housing unit to the lobby, striking him with closed-fist punches. (Id.). A corrections officer managed to restrain Peterkin while Arnold retreated into the housing unit. (Id.).

Artis then ran from the housing unit, across the lobby, and into the corridor in an attempt to assault Arnold. (Id.). Wolford and Strope met Artis in the corridor, positioned themselves in between Arnold and Artis, and gave Artis orders to get on the floor. (Id.). According to the UOF Report, Artis continued charging toward Arnold despite Wolford and Strope's orders. (Id.). Wolford then deployed pepper spray on Artis, but Artis continued refusing corrections officers' orders, so Wolford and Strope took him to the floor. (Id.). Wolford and Strope again gave Artis orders to place his hands behind his back, but Artis continued to struggle, attempting to get back up from the floor. (Id.). At that point, "Wolford applied elbow strikes to Inmate Artis'[s] head and shoulder areas" in an effort to get him to comply. (Id.). Wolford and Strope were then able to handcuff Artis and escort him "to the HU2 Medical Room to await medical treatment." (Id.). NBCI's video surveillance system captured footage of the incident, (id.), but the lobby area where Wolford and Strope allegedly assaulted Artis is not visible from any of the cameras, (see

8

Video Surveillance Footage). Lt. Sawyers concluded that the level of force that Wolford and Strope used was "appropriate and consistent with all applicable policies and the DPSCS Use of Force Manual." (UOF Rep. at 3).

According to the UOF Report, Evans treated Artis, Peterkin, and Arnold for pepper spray exposure. (Id.). On March 27, 2017, after Artis filed a grievance through the Administrative Remedy Procedure, Sgt. Robert Fagan of the Intelligence and Investigative Division began another investigation of the incident. (Intelligence and Investigative Division Report ["IID Rep."] at 1–2, ECF No. 17-8). On March 30, 2017, Fagan interviewed Artis and Peterkin. (Id. at 10). At that time, Artis stated that he was sprayed with pepper spray while lying on his stomach, that he was not resisting, and that he was trying to hold his arms to allow officers to handcuff him. (Id.). Artis also stated that the officers were holding his arms while punching, kicking, and elbowing him to the back of his head. (Id.). Likewise, Peterkin stated that he saw officers jump on Artis and "kick and punch him." (Id.). According to Peterkin, the "staff went overboard," there were about seven to ten officers present, and "Artis was already on the ground and the Officers were yelling that he was resisting but he wasn't." (Id.).

On April 26, 2017, Fagan obtained the video footage of the incident. (Id.). He noted that although the video showed Artis running toward Arnold, it did not show Wolford and Strope restraining Artis. (Id.).

On November 20, 2017, Fagan interviewed Wolford and Strope. (Id. at 10–11). Wolford stated that the pepper spray seemed to have no effect on Artis and that Artis continued to resist after the officers brought him to the ground. (Id. at 10). Wolford also

9

stated that he delivered elbow strikes to Artis in an effort to get him to comply until additional staff arrived. (Id.). Similarly, Strope stated that Artis continued to struggle after he was brought to the ground, and that Wolford applied elbow strikes to Artis's head and shoulders to get him to comply. (Id. at 11). Wolford and Strope both stated that they did not witness anyone kicking Artis. (Id.).

At the conclusion of the investigation, Fagan noted that although both Artis and Peterkin reported that corrections officers kicked Artis, Evans's medical report did not support that level of force. (Id.). As a result, Fagan concluded that there was no evidence to show that staff used unreasonable force to control Artis. (Id.).

### 5.    Jeffrey S. Carter's Expert Report

Artis attached to his Opposition an expert report by Jeffrey S. Carter. Carter worked as a correction officer and became an "academy instructor" offering trainings to new recruits. (Expert Rep. Jeffrey S. Carter ["Carter Rep."] ¶¶ 3–4, ECF No. 70-4). He also worked as a director at a jail, a safety officer, a custody sergeant, and an internal affairs investigator. (Id. ¶¶ 6–9). Carter opined that "force was needed in the situation with Mr. Artis, but the force used was not reasonable." (Id. ¶ 68). Carter indicated that Wolford's elbow strikes to Artis's head and shoulders were unreasonable because head strikes "should only be used as a last resort." (Id. ¶ 77). Because Artis was unarmed and Wolford and Strope were physically larger than him, "the head strikes were not warranted and were executed with the intent of causing physical harm to Mr. Artis instead of techniques to secure Mr. Artis [such] as a compliance hold." (Id. ¶ 79).

Carter opined further that the use of force investigation was "cursory" and "[fell] way short of meeting [the] industry standard relating to an administrative investigation." (Id. ¶ 84). Carter indicated that there were additional questions that should have been asked during the investigation and that the investigation was "grossly delayed in being completed without any documented reason." (Id. ¶¶ 86–88). Carter found that the investigation involved too many errors and, in his opinion, the "investigation was not taken seriously by NBCI." (Id. ¶ 99).

## B.   Procedural History

On August 22, 2017, while Fagan was still conducting his investigation, Artis sued Bishop, Wolford, and Strope, as well as Deputy Secretaries Wendell M. France and J. Michael Zeigler. (ECF No. 1). In his six-count[3] Verified Complaint, Artis alleges: excessive force in violation of the Eighth Amendment to the U.S. Constitution (Count I); deliberate indifference to serious medical need in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution (Count II); violations of Articles 24 and 26 to the Maryland Constitution (Count III); negligence (Count IV); failure to properly train or supervise in violation of the Fourteenth Amendment to the U.S. Constitution (Count V); and emotional distress (Count VI). (Compl. at 9–15). Artis seeks money damages, injunctive relief, a transfer to a different prison, and costs. (Id. at 16–17; Compl. Suppl. at 4, ECF No. 5).

---

[3] Artis styles his Counts as "causes of action" and terms each alleged act that purportedly violated the law as a "count." (See Compl. at 9–15).

On May 18, 2018, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 17). Artis filed an Opposition on June 1, 2018, and supplemented it on August 1, 2018. (ECF Nos. 22, 25). On March 19, 2019, the Court issued a Memorandum Opinion and Order granting summary judgment on behalf of Defendants Ziegler and France as to the supervisory liability claim and otherwise denying Defendants' Motion. (ECF Nos. 26, 27). The Court held that all Defendants failed to address Artis's state law claims, leaving them "viable." (Mem. Op. at 18 n.10, ECF No. 26).

On April 17, 2019, the Court appointed pro bono counsel to represent Artis. (ECF No. 34). On September 30, 2019, Defendants Ziegler and France filed another Motion to Dismiss (ECF No. 43) for failure to state a claim. That same day, Defendants Bishop, Strope, and Wolford filed a partial Motion to Dismiss. (ECF No. 44). Both motions were unopposed. The Court granted Ziegler and France's motion and granted in part and denied in part Bishop, Strope, and Wolford's motion. (ECF No. 57). Defendants Ziegler and France were then dismissed from the action. (ECF No. 57).

On March 5, 2021, Bishop, Strope, and Wolford moved for summary judgment. (ECF No. 69). Artis filed an Opposition on March 15, 2021. (ECF No. 70). To date, Defendants have not filed a Reply.

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's

favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is genuine dispute of material fact. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Id.</u> If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986) (quoting <u>Anderson</u>, 477 U.S. at 247).

**B.**    **Analysis**

Defendants argue that Artis failed to demonstrate a violation of his constitutional rights under § 1983 for his claims of excessive force and denial of medical care. Defendants argue further that Bishop is not liable as a supervisor under § 1983 and that all Defendants are entitled to qualified immunity and state immunity.

**1.**    **Section 1983 Claims**

**a.**    **Excessive Force**

Defendants first argue that they are entitled to judgment on Count I, Artis's excessive force claim. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." <u>Boone v. Stallings</u>, 583 F.App'x 174, 176 (4th Cir. 2014) (per curiam) (quoting <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996)). In cases involving excessive force, the Court must determine: (1) "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"—the subjective component, <u>Thompson v. Commonwealth of Virginia</u>, 878

F.3d 89, 98 (4th Cir. 2017) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 6–7 (1992); and (2) "whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious"—the objective component. <u>Boone</u>, 583 F.App'x at 176 (quoting <u>Williams</u>, 77 F.3d at 761).

To determine whether Defendants acted maliciously or sadistically to cause harm, the first element, the Court applies a nonexclusive, four-factor balancing test: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." <u>Thompson</u>, 878 F.3d at 99 (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 239 (4th Cir. 2008)).

Defendants argue that Artis failed to demonstrate a constitutional violation. (Defs.' Mem. Support Mot. Summ. J. ["Defs.' Mot."] at 16–17, ECF No. 69-1). They contend the "little force" that was used was "necessary to maintain order" when Artis attempted to attack Arnold. (<u>Id.</u> at 16). They argue further that Artis had "clear intent" to assault Arnold, and that "[s]taff presence, verbal commands, and pepper spray were ineffective" in stopping him. (<u>Id.</u>). Accordingly, they state the use of force was necessary "to gain compliance." (<u>Id.</u> at 16–17). Defendants argue further that the medical records do not support the argument that "any amount of excessive force was used," asserting that because Artis was not severely injured, he "hardly" demonstrated that the use of force was "excessive." (<u>Id.</u> at 17). Artis responds that there is a genuine dispute of material fact "as

15

to whether there was a need for the application of force." (Pl.'s Mem. Points Authorities Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. ["Pl.'s Opp'n"] at 7, ECF No. 70).

At bottom, there are genuine disputes of material fact as to both the amount of force used against Artis and the point at which Artis complied with the officers' commands. Artis testified that when he was first maced, he fell to the ground and became compliant. (Artis Dep. at 68:12–20, 69:9–21, 71:16, 73:15–19, 75:1–5). Nonetheless, he alleges that he was maced a second time while on the ground. (Id. at 69:9–21). He also states that he was placed in handcuffs before Wolford and Strope struck him repeatedly with elbow strikes and punches to his head. (Id. at 67:6–18, 73:15–19, 77:14–78:3).

Wolford, on the other hand, testified that Artis was resisting by trying to get up and also laying on his hands so that officers were unable to place him in handcuffs, necessitating the elbow strikes. (Wolford Dep. at 64:19–65:12). He also stated that once Artis was handcuffed, all use of force stopped. (Id. at 66:22–67:4). Strope, like Wolford, testified that Artis resisted, causing Wolford to strike Artis after he was maced. (Strope Dep. at 62:1–17). Neither Wolford nor Strope testified that Artis was pepper sprayed more than once. (See generally Wolford Dep., Strope Dep.).

Accordingly, the parties dispute key facts about whether Artis was compliant, when he was placed in handcuffs—in particular, whether Defendants placed him in handcuffs before or after striking him on his head and neck—and whether he was pepper sprayed more than once. Given these factual disputes, the Court cannot determine as a matter of

law whether the use of force was excessive. Accordingly, the Court will deny judgment on Artis's excessive force claim (Count I).[4]

### b.     Denial of Medical Care

Next, Defendants argue that Artis failed to show that he was denied access to appropriate medical care under 42 U.S.C. § 1983. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976) (citing Furman v. Georgia, 408 U.S. 238, 392–93 (1972)). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)). It is well-established that

---

[4] Artis makes a separate argument that use of pepper spray is not per se excessive. (Defs.' Mot. at 12–15). The Court sees no need to review the use of pepper spray separately from the rest of Artis's excessive force claims. For the reasons provided above, the Court will deny Defendants' argument as to Count I.

prompt washing and medical attention sufficiently mitigate the effects of chemical agents. Kitchen v. Ickes, 116 F.Supp.3d 613, 629 (D.Md. 2015) (citing Williams, 77 F.3d at 763), aff'd, 644 F.App'x 243 (4th Cir. 2016).

Defendants argue that they took Artis to the nurse for treatment immediately after the use of force. (Defs.' Mot. at 20). They assert, therefore, that they "demonstrated the antithesis of deliberate indifference" through their prompt action. (Id.). They argue further that the "medical records do not support that [Artis] was denied medical care or a contamination shower at all." (Id. at 21). Artis responds that although the nurse recommended that he have a decontamination shower to wash off the pepper spray, he was not allowed to take one for several days. (Pl.'s Opp'n at 8). He responds further that Wolford and Strope knew he was supposed to be given an opportunity to take a decontamination shower but returned him to his cell without letting him get cleaned up. (Id. at 9).

Here, there are genuine disputes of material fact as to when Artis was allowed to take a decontamination shower and whether Wolford and Strope heard the nurse's treatment recommendations and ignored them. The medical records show that Evans evaluated Artis around 10:00 a.m. on March 19, 2017. (Pl.'s Med. Rs. at 43). The report from the visit does not state that Artis was pepper sprayed but did include a recommendation to offer him a decontamination shower. (Id.). The medical records from later in the day do not state whether Artis was actually offered that shower. (Id.). Artis testified in his deposition, though, that he was taken directly to his cell and that he was not

permitted to shower for two days, when he was next on the routine shower schedule. (Artis Dep. at 104:10–105:17).

Moreover, Artis testified that Wolford and Strope were present during the visit and that Evans specifically told them that he needed a decontamination shower. (Id. at 90:17–21). Strope, on the other hand, disputes being present during the medical visit and testified that after he and Wolford took Artis to Evans, they were relieved by "other people." (Strope Dep. at 66:12–22). For his part, Wolford did not recall if he and Strope escorted Artis to the medical unit at all. (Wolford Dep. at 67:19–22). Accordingly, there is a factual dispute regarding whether Wolford and Strope knew of the nurse's recommendation and whether they allowed Artis to take a shower before he was taken to his cell. As these material facts remain in dispute, the Court cannot conclude as a matter of law that Wolford and Strope did not deny Artis medical care. The Court will therefore deny summary judgment as to Count II.

### 2.    Supervisory Liability

Defendants argue that they are entitled to judgment as to Count V, supervisory liability under § 1983. There is no respondeat superior liability under § 1983. Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Thus, "for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Garraghty v. Com. of Va., Dep't of Corr., 52 F.3d 1274, 1280 (4th Cir. 1995) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)). It is well-settled, however, that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Baynard v.

<u>Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994)). Supervisory liability "is not based on ordinary principles of <u>respondeat superior</u>, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" <u>Id.</u> (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices []; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

<u>Id.</u> (quoting <u>Shaw</u>, 13 F.3d at 799).

Defendants argue that there is no basis for a finding that Bishop violated Artis's constitutional rights. (Defs.' Mot. at 23). They contend that although Artis sent Bishop a letter regarding Wolford's harassment, this "singular instance is hardly pervasive." (<u>Id.</u>). Moreover, they argue that Bishop's decision to "assign[] it for investigation" was proper. (<u>Id.</u>). Artis responds that Bishop knew or should have known that Wolford's behavior posed a risk. (Pl.'s Opp'n at 9). Further, he contends that Wolford's decision to deploy elbow strikes was inappropriate and because Bishop had the opportunity to intercede in 2015, he could have intervened and avoided the entire conflict. (<u>Id.</u>).

As noted above, Artis complained of Wolford's harassment in a letter to Bishop in 2015. Bishop responded to the letter and said that they "don't transfer inmates to avoid problems." (Artis Dep. at 142:3–9). Accordingly, there is evidence that Bishop had knowledge of Wolford's treatment of Bishop. Artis has alleged that even though he complained, Wolford's behavior did not stop, and he has argued further that Wolford may have used unnecessary force in part because of the contentious relationship between the two. (Artis Dep. at 134:1–3; Pl.'s Opp'n at 9). Therefore, Artis has produced evidence that Bishop demonstrated deliberate indifference by not intervening after receiving notice of his conduct and that his failure to act was causally related to Wolford's alleged use of excessive force in 2017. Further, Artis has presented an expert opinion that the investigation was inadequate. Drawing all justifiable inferences in Artis's favor, a reasonable juror could find that Bishop demonstrated deliberate indifference. Accordingly, Defendants' motion as to Count V, failure to properly train or supervise, will be denied.

### 3. Immunity

#### a. Qualified Immunity

Defendants assert that they are all entitled to qualified immunity as to all counts. The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Courts use a two-prong test to determine whether a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether

that right was "clearly established" at the time of the purported violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts have discretion to resolve these two prongs in whatever order they consider appropriate based on the circumstances of the case at hand. Id. at 236. The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds. Batten v. Gomez, 324 F.3d 288, 293–94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first prong, Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993); the defendant on the second, Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

Defendants argue that they are entitled to qualified immunity as to all claims because "[t]he evidence has established that the Defendants have not violated any clearly established constitutional right of which a reasonable public official should have known." (Defs.' Mot. at 23). Defendants also contend that their conduct was objectively reasonable because Artis was threatening to harm Arnold. (Id. at 24). As explained above, because genuine disputes of material fact exist as to whether Defendants violated Artis's constitutional rights under the Eighth and Fourteenth Amendments, the Court cannot determine as a matter of law that Defendants are entitled to qualified immunity. Accordingly, the Court will deny Defendants' Motion as to all counts on qualified immunity grounds.

### b.    State Law Immunity

Defendants also assert that they are immune from liability under Maryland law as to all counts. Maryland law grants immunity to state officials for acts committed

(1) without malice or gross negligence and (2) within the scope of the public employee's duty. Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). Corrections officers are state officials. Cooper v. Rodriguez, 118 A.3d 829, 848 n.13 (Md. 2015). Whether officers are entitled to statutory immunity requires a factual determination of the officer's subjective intent and is usually reserved for the trier of fact. Martin v. Conner, 882 F.Supp.2d 820, 836–38 (D.Md. 2012). Defendants argue that Artis "cannot establish facts demonstrating the high level of conduct showing actual malice by Officers Wolford and Strope, or any gross negligence by Warden Bishop." (Defs.' Mot. at 26). At bottom, the Court will deny judgment on state immunity grounds as to all counts.

First, as to Wolford, there are genuine disputes of fact relevant to a determination of whether he acted with actual malice. Artis and Wolford present different stories on their background; while Artis recalls ongoing harassment, Wolford claims that their relationship was neutral and not notable. Additionally, Artis and Wolford dispute the amount of force Wolford used (i.e., whether Wolford pepper sprayed Artis a second time when he was already on the ground and whether Artis had complied before Wolford executed elbow strikes) and whether Wolford stopped using force when Artis complied. Viewing the evidence in the light most favorable to non-movant Artis, a reasonable juror could accept his version of events and find that Wolford's conduct was malicious. Next, as for Strope, there is a similar dispute of fact as to whether Artis was compliant when Strope punched him. A finder of fact could determine that Artis was already in handcuffs or was otherwise compliant when Strope hit him repeatedly and could therefore conclude that Strope acted with actual malice.

Finally, as to Bishop, and as stated above, there is evidence that Bishop was aware of Wolford's treatment of Artis and that he failed to intervene. Further, there is evidence to suggest that the use of force investigation was unreasonably flawed. The fact finder could determine that Bishop's failure to correct Wolford's behavior after receiving notice and before the altercation, as well as in the direction of the investigation, rose to the level of gross negligence. Accordingly, the Court cannot as a matter of law grant judgment on behalf of Defendants. The Court will deny Defendants' Motion on state immunity grounds as to all counts.[5]

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Defendants Warden Frank B. Bishop, Jr., C.O. II Jeremy W. Wolford, and C.O. II James A. Strope's Motion for Summary Judgment (ECF No. 69). A separate Order follows.

Entered this 18th day of November, 2021.

_____/s/_____
George L. Russell, III
United States District Judge

---

[5] The Court notes that Artis, acting pro se, filed an unopposed Motion for Order to Show Cause for a Preliminary Injunction on Temporary Change of Custody from Frank B. Bishop, Westen Region Commissioner, et al., to Another Region in the Custody of DPSCS. (ECF No. 71). The Court cautions Artis that because he is represented, his filings with the Court must go through counsel. To the extent Artis is experiencing irreconcilable differences with his counsel, he should notify the Court.

The Court further notes that the filing will be discussed during the upcoming teleconference.